

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE STEIN

LAUNDRY, DRY CLEANING WORKERS AND
ALLIED INDUSTRIES HEALTH FUND, UNITE HERE! and
LAUNDRY, DRY CLEANING WORKERS AND
ALLIED INDUSTRIES RETIREMENT FUND, UNITE HERE!
Petitioners,

08 CIV 7121.

-v.-

**PETITION TO CONFIRM
ARBITRATION AWARD**

MULTI-PAK CORPORATION,
Respondent,

RECEIVED AUG 11 2008 U.S.D.C. S.D. N.Y. CASHIERS

STATE OF NEW YORK     )
                      ) ss:
COUNTY OF NEW YORK    )

The Petition of the Laundry, Dry Cleaning Workers and Allied Industries Health Fund, UNITE HERE! and Laundry, Dry Cleaning Workers and Allied Industries Retirement Fund, UNITE HERE! (hereinafter, the "Petitioners" or "the Funds"), by their attorney David C. Sapp, Esq., respectfully shows to this Court and alleges that:

1.      I am Counsel to Petitioners herein, and am duly admitted to practice law before the courts of the State of New York and before this Court and am fully familiar with the prior proceedings had in this matter. I submit this Petition in support of Petitioners' application for an order confirming the Arbitration Award of Philip Ross (hereinafter, the "Arbitrator"), dated June 17, 2008. (A copy of the Award is annexed hereto as **Exhibit A**).

2.      The Funds, with their sole office at 275 7th Avenue, New York, New York 10001, are employee benefit plans within the meaning of Section 3 (3) of the Employee Retirement Income Security Act of 1974, as amended (hereinafter, "ERISA"), 29 U.S.C. §1002 (3). The Funds are established pursuant to an Agreement and Declaration of Trust and by a Collective Bargaining Agreement entered into between the Laundry, Dry Cleaning and Allied Workers Joint Board, UNITE HERE (hereinafter, the "Union"), and employers engaged in the cleaning and dyeing industry. The Funds were created to provide benefits to eligible employees of contributing employers.

3.      Multi-Pak Corporation (hereinafter, the "Respondent"), 180 Atlantic Street, Hackensack, New Jersey 07601, is a party to a Collective Bargaining Agreement and Supplemental Agreement ("the CBA") thereto, with the Union. (A copy of the CBA is annexed hereto as **Exhibit B**). The CBA obligates the employer to contribute to the Funds, based upon stated percentages of its gross payroll.

4.      A dispute has arisen concerning Respondent's obligation for delinquent contributions owed to the Funds. The Funds allege that the Respondent owes contributions to the Funds for the period from April 1, 2008 through May 31, 2008 in the amount of $2,237.27.

5.      Pursuant to the CBA, the dispute was referred to the Arbitrator for arbitration on June 17, 2008.

6.      Prior to the arbitration the Petitioners served a subpoena upon the Respondent directing it to produce its payroll records. The Respondent failed to produce its books and records or to appear at the arbitration hearing. (A copy of the subpoena is annexed hereto as **Exhibit C**).

7.      At the June 17, 2008 Arbitration, Petitioners presented the following evidence to Arbitrator Ross:

> a.      The provisions of the CBA obligating Respondent to make employee benefit contributions to Petitioners and produce books and records obligating the parties to arbitrate disputes, including disputes over delinquent employee benefit fund contributions (see Exhibit B);

> b.      The Notice of Arbitration Hearing, which was served on Respondent on May 28, 2008 (A copy of the Notice of Arbitration Hearing is annexed hereto as **Exhibit D**);

> c.      A subpoena duly served on Respondent on May 28, 2008 requesting Respondent to produce all books and records necessary to compute the exact sum owing to Petitioners by Respondent (See Exhibit C);

> d.      An exhibit summarizing the delinquent contributions sought in the arbitration, which stated the payroll for the period of delinquency, the contribution rate and the calculation of the delinquent contributions due, interest, liquidated damages, Auditor's fees and costs and legal fees thereon. The exhibit established that the period for which the Award was sought, was for the period of April 1, 2008 through May 31, 2008 plus interest, costs and fees, all totaling $2,865.19, which was awarded by the Arbitrator. (A copy of the exhibit is annexed hereto as **Exhibit E**).

8.      As the record presented to the Arbitrator is a sufficient basis for the Award, the instant petition complies with the standard for petitions to confirm established in D.H. Blair & Co., Inc. -v.-Gottdiener, 462 F.3d 95 (2d Cir. 2006).

9.      After considering the evidence presented at the hearing, Arbitrator Philip Ross issued an Arbitration Award directing the Respondent to pay the delinquent contributions in the amount of $2,237.27, plus interest thereon through the date of the award in the amount of $48.47, liquidated damages in the amount of $447.45, Auditor's fees and costs in the amount of $32.00, and legal fees in the amount of $100.00 for a total award of $2,865.19. The Arbitration Award also directed Respondent to fully comply with the Subpoena issued in this proceeding and produce to Petitioners for examination all of the payroll records including, but not limited to, social security quarterly reports, weekly payroll journals, state employment insurance records, cash disbursements books, summary quarterly reports and any other books or records which are required to determine the liability to the Petitioners, for the period of April 1, 2008 through the date of hearing.

10.     On June 24, 2008, the Petitioners served a copy of the Arbitration Award on Respondent, by regular mail and an additional copy by certified mail return receipt requested.

11.     To date, Respondent has failed to satisfy any part of the Arbitration Award.

12.      As a result of Respondent's failure to abide by the Arbitration Award, the Funds now seek judicial enforcement thereof. This Court has jurisdiction over Respondent pursuant to ERISA.

13.      A copy of the Funds' Plan Rules is annexed hereto as **Exhibit F**. The Plan Rules provide for interest at the rate 18% per annum and for liquidated damages at the rate of 20% on the delinquent contributions. This is in accordance with ERISA Section 502 (g) (2), 29 U.S.C. §1132 (g) (2), which provides for interest, liquidated damages, costs and attorneys' fees in actions to recover delinquent contributions. Accordingly, the Arbitrator awarded interest and liquidated damages at such rates through the date of Arbitration Award.

**WHEREFORE**, your Petitioners pray for an order confirming the Arbitration Award, and directing the entry of judgment in favor of Petitioners in the amount of $2,865.19 together with interest from the date of the Arbitration Award to the date of judgment, together with the costs incurred, in connection with this Petition and directing Respondent to fully comply with the Subpoena issued in the Arbitration proceeding and produce to Petitioners for examination all of the payroll records including, but not limited to, social security quarterly reports, weekly payroll journals, state employment insurance records, cash disbursements books, summary quarterly reports and any other books or records which are required to determine the liability to the Petitioners, for the period of April 1, 2008 through the date of hearing.

Dated:   August 7, 2008
         New York, New York

David C. Sapp – (DS 5781)
Attorney for Petitioners
730 Broadway, 9th Floor
New York, New York 10003-9511
(212) 539-5576

# EXHIBIT A

In the Matter of
ARBITRATION OF DISPUTES

between

LAUNDRY, DRY CLEANING WORKERS AND
ALLIED INDUSTRIES HEALTH FUND, UNITE HERE! and
LAUNDRY, DRY CLEANING WORKERS AND
ALLIED INDUSTRIES RETIREMENT FUND, UNITE HERE!,
Petitioners,

and

MULTI-PAK CORPORATION,
Respondent.

**FINDINGS AND AWARD
08 – 16 – R**

Due notice having been given to the parties, a hearing was held before the undersigned in New York City on June 17, 2008.

A P P E A R A N C E S :

| | |
|---|---|
| The Arbitrator: | Dr. Philip Ross |
| For the Petitioners: | David C. Sapp, Esq.<br>Rose-Magallie Maitre<br>Evelyn Soto |
| For the Respondent: | No Appearance |

### FINDINGS

This proceeding was instituted by the service of a statutory Notice of Intention to Arbitrate, in which it was alleged that Multi-Pak Corporation (hereinafter, the "Respondent"), has entered into a written Collective Bargaining Agreement (hereinafter, the "Agreement"), with the Laundry, Dry Cleaning and Allied Workers Joint Board, UNITE HERE (hereinafter, "Union"), in which, pursuant to applicable law, the Respondent was notified that unless it applied to stay the proposed arbitration within 20 days after the service of the aforesaid Notice, it would be barred from putting in issue the making of the said Agreement and its failure to comply therewith. More than 20 days have elapsed since the service of the aforesaid Notice at the time of the hearing in this proceeding held as above stated, and no application to stay this proceeding has been made by the Respondent.

On the basis of the aforesaid Notice of Intention to Arbitrate, Respondent's failure to apply to stay this proceeding, and other evidence submitted[1], I find that, as alleged by the Laundry, Dry Cleaning Workers and Allied Industries Health Fund, UNITE HERE! and Laundry, Dry Cleaning Workers and Allied Industries Retirement Fund, UNITE HERE! (hereinafter, the "Petitioners"), the Respondent entered into the Agreement with the Union that, among other things, provides that the Respondent is regularly to pay a stated percentage of its payroll to the Petitioners. These payments are commonly known as contributions.

The Agreement further provides as follows:

> The Employer shall furnish to the Trustees, upon request, such information and reports as they may require in the performance of their duties under any of the agreements and declarations of trust.

A subpoena was duly served on the Respondent requiring it to produce at the offices of the Union on June 17, 2008, all of the relevant books and records from which could be computed the exact sums due to the Petitioners for the period April 1, 2008 through the date of hearing.

From the evidence made available to me, I find that the Respondent failed to make the following contributions for the period of April 1, 2008 through May 31, 2008 in the amount of $2,237.27; that demand for payment was duly made and refused and that there is now due and owing from the Respondent to the Petitioners the sum of $2,237.27 for delinquent contributions.

The Award which follows does not intend to and does not include any sums that may be due to the Petitioners for any period other than stated above nor for any sums due to the Petitioners for the period stated above, and which would be shown upon an audit of the Respondent's books and records for such period, the results of such an audit not being available to me as Arbitrator due to Respondent's failure to comply with the Subpoena directed to it.

The Funds' Plan Rules provide that:

> The Fund shall, in all proceedings brought to collect delinquent contributions and/or audit deficiencies seek, in addition to said delinquent contributions and/or audit deficiencies:
>
> a) Interest at the rate of 18% on all sums due.
> b) Liquidated damages equal to 20% of the delinquent contributions.
> c) Attorney's fees, audit fees and costs of the proceedings.
> d) Such other legal and equitable relief as deemed appropriate.

The Respondent having failed to perform and comply with the terms and provisions of the Agreement, as herein above found, and such default having resulted in expenditures by the

---

[1] The evidence I considered included (A) The Agreement; (B) A summary of the delinquent contributions sought in the arbitration; (C) The Notice of Intention to Arbitrate; and (D) A Subpoena duly served on Respondent.

2

Petitioners, I further direct that the Respondent pay to the Petitioners, such expenditures as follows, each of which I find to be reasonable in amount: legal fees in the amount of $100.00; auditing and accounting costs in the amount of $32.00; for total costs of $132.00.

In addition, I direct that in compliance with the Fund's Plan Rules and the provisions of ERISA Section 502 (g) (2), the Respondent pay to the Petitioner interest on the unpaid contributions "at a rate of 18%" plus "liquidated damages equal to 20% of the delinquent contributions." Therefore, I direct that in accordance with the statutory formula, Respondent pay Petitioners the sum of $48.47 in interest on the delinquent contributions, which sum is hereby awarded against the Respondent in favor of the Petitioners, and further direct that Respondent pay Petitioners the sum of $447.45 as liquidated damages, which sum is hereby awarded against the Respondent in favor of the Petitioners.

## AWARD

Accordingly, it is hereby determined and awarded as follows: there is due and owing from the Respondent to the Petitioners the sum of $2,237.27 for unpaid contributions; the sum of $48.47 for interest provided for under ERISA Section 502 (g) (2); the sum of $447.45 for liquidated damages provided for under ERISA Section 502 (g) (2), the sum of $32.00 for Auditor's fees and costs; and the sum of $100.00 for legal fees; for a total amount of $2,865.19, which total amount is hereby awarded against the Respondent in favor of the Petitioners and which total amount the Respondent is to pay Petitioners forthwith; and

It is hereby further determined and awarded that Respondent fully comply with the Subpoena issued in this proceeding and produce to Petitioners for examination all of Respondent's payroll records including, but not limited, to social security quarterly reports, weekly payroll journals, state employment insurance records, cash disbursements books, summary quarterly reports and all other books and records which are required by Petitioners to determine Respondent's liability to the Petitioners for the period April 1, 2008 through May 31, 2008.

Dated: 6 | 7 | 08
New York, New York

_____
PHILIP ROSS, ARBITRATOR

**EXHIBIT** B

6290156

**MEMORANDUM OF UNDERSTANDING** made as of October 12, 2002 by and between the Laundry, Dry-Cleaning & Allied Workers Joint Board, UNITE, AFL-CIO, CLC ( the Union ) and Multi Pack Corp. N.J. ( the employer )

Where As the Employer and the Union are parties to a collective bargaining agreement which expired on October 12, 2002 and;

Where As the Employer and the Union have reached certain understandings with respect to the terms and conditions of a new collective bargaining agreement ( hereinafter collectively referred to as the agreement ).

Now Therefore, in consideration of the parties agree as follows:

1.    The collective bargaining agreement between the Union and the Employer covering the period of October 13, 1999 through October 12, 20002 (Agreement ) is extended for the period of October 13, 2002 through October 11, 2005 upon all the same terms and conditions except as expressly otherwise provided herein.
Any and all improvements to the wages and/or fringe benefits of the Employer's employees who are covered by the Agreement shall be made retroactive to and shall be effective as of October 12, 2002, the original expiration date of the Agreement.

2.    The Employer shall grant wage increases and shoe voucher as follows:
Shoe voucher ( $50.00 ) to be effective in the second year of the contract

| October 12, 2002 | October 12, 2003 | October 12, 2004 |
|---|---|---|
| .35 cents per hour | .35 cents per hour | .35 cents per hour |

3.    The Employer agrees to make his contributions to the Laundry and Dry cleaning Workers Fund , as follows:

| October 12, 2002 | October 12, 2003 | October 12, 2004 |
|---|---|---|
| 8 ½ % | 8 ½ % | 8 ½ % |

The Agreement shall be effective October 12, 2002 and shall continue in full force and effect through October 11, 2005 and shall be automaticaly renewed from year to year thereafter, unless sixty (60 ) days prior to the expiration date of this Agreement or any renewal thereof, notice in writing by certified  mail is given by either party to the other of its desire to propose changes in the Agreement or of its intention to terminate the same in either of which event, the Agreement shall terminate on the expiration date next following said notice.

Multi Pack Corp.(employer)    Laundry, Dry-Cleaning& Allied Workers Joint Board
                             UNITE, AFL-CIO, CLC

By                           By
                             Wilfredo N. Larancuent (Manager)

**THIS AGREEMENT is made and entered into as of the 14th day of October, 1996, by and between MULTI-PAK CORP., (hereinafter referred to as the "EMPLOYER"), and the AMALGAMATED SERVICE AND ALLIED INDUSTRIES JOINT BOARD, AMALGAMATED CLOTHING AND TEXTILE WORKERS UNION, AFL-CIO, CLC, (hereinafter referred to as the "UNION").**

WITNESSETH: That for the purposes of mutual understanding and in order that harmonious relations may exist between the Employer, the Union and the employees to the benefit and welfare of each and in the interest of efficient operations and industrial peace, NOW, THEREFORE, in consideration of the mutual promises herein contained and for other good and valuable consideration, the parties hereto agree as follows:

## ARTICLE I
## RECOGNITION

Section 1. 1: The Employer recognizes the Union as the exclusive representative for purposes of collective bargaining regarding wages, hours and working conditions of all of the employees covered by this Agreement. This Agreement covers "All production and maintenance employees employed by the Employer at its 180 Atlantic Avenue, Hackensack, New Jersey, location but excluding all service and installation employees, managerial employees, office clerical, professional employees, guards and supervisors as defined in the National Labor Relations Act, as amended, and all other employees".

Section 1.2: The use of the male gender in this Agreement is understood to be for convenience only, and every provision in this Agreement shall apply equally to male and female employees.

## ARTICLE II
## MANAGEMENT RIGHTS

Section 2. 1. Subject only to such limitations as may be specifically imposed by this Agreement, the Union recognizes that the entire management of the plant and direction of the working force is vested exclusively in the Employer, including, but not limited to, the right to schedule work; to assign work and working hours to employees; to establish quality standards and the most efficient means of production; to institute, modify and/or eliminate incentive systems; to require from every employee efficient utilization of his services; to formulate and enforce plant rules and regulations not inconsistent with he terms of this Agreement; to hire, suspend, promote, demote, transfer,discharge or relieve employees from duty because of lack of work or for other legitimate reasons; to install and maintain the most efficient machinery and equipment; to judge skill and ability, to create, eliminate or consolidate job classifications; to determine the location of its plant or other facilities; to subcontract work;

-1-

and to cease operations in whole or in part.

Section 2.2 : It is the express intention of the parties hereto that all matters affecting the wages, hours and working conditions of the employees covered hereby which are not specifically governed by this Agreement remain within the exclusive discretion of the Employer until the expiration of this Agreement.

## ARTICLE III
## NO STRIKE; NO LOCKOUT

Section 3. 1: There shall be no strike, sympathy strike, picketing, refusal to cross a picket line (except a picket line established by the Union), slowdown or other interruption of work by the Union, its members, representatives or agents, or the employees covered hereby during the term of this Agreement. There shall be no lockout by the Employer during the term of this agreement.

Section 3.2: Notwithstanding the provisions of article IV of this Agreement, in the event of a violation of Section 3.1 of this Agreement, the injured party may have recourse to the courts or to the National Labor Relations Board for remedy or remedies.

Section 3.3: Any employee who engages in conduct violatitive of Section 3.1 of this Agreement shall be subject to discharge or other discipline without recourse to the arbitration provisions of this Agreement except as to the issue of whether he engaged in such conduct; and if the Arbitrator finds that the employee engaged in such conduct, he shall have no authority to disturb the discharge or other discipline assessed by the Employer.

## ARTICLE IV
## ADJUSTMENT OF GRIEVANCES

Section 4.1: A grievance is hereby defined as a complaint, dispute or controversy concerning the interpretation or application of this Agreement.

Section 4.2: Grievances shall be adjusted in the following manner exclusively:

Step I. Within seven (7) working days after the occurrence giving rise to the grievance, it shall be reduced to writing and taken up between a Shop Steward and a representative of the Employer.

Step II. If not satisfactorily resolved at Step I within seven (7) working days after the occurrence giving rise to the grievance, the grievance shall be taken up by the business representative of the Union and a designated representative of the Employer within ten (10) working days after the written grievance was first presented to the other party.

Step III. If not satisfactorily resolved at Steep II within seventeen (17) working days after the written grievance was first presented to the other party, either party may submit the grievance to arbitration by written notice to the other party within twenty-five (25) working days after the written grievance was first presented to the other party. The Union's decision not to take a grievance to arbitration shall be binding on the employees.

Section 4.3: The Arbitrator under this Agreement shall be the Arbitrator to be named in the Collective Bargaining Agreement between the Linen and Laundry Supply Industry and the Union effective December 1, 1981. Until such an Arbitrator is named, the Arbitrator shall be selected under the procedure set forth in Article IV Section 4.3 of the 1978-1981 Collective Bargaining Agreement between the Employer and the Union. Each party shall bear its own expenses in these arbitration proceedings, except that they shall pay the fee and other expenses of the arbitrator according to the practice of the Linen and Laundry Supply Industry.

Section 4.4. The Arbitrator's authority shall be limited to the interpretation of the Agreement and the fashioning of remedies most appropriate and necessary to cure a breach of the Agreement. The Arbitrator shall have no authority to add to, subtract from, alter or amend any of the provisions of this Agreement or to assess punitive remedies. The awards of the Arbitrator within his jurisdiction and authority shall be final and binding upon the Employer, the Union and the employees.

Section 4.5. The Employer may initiate a grievance at Step II. The Union may initiate a grievance of plant-wide or general significance at Step II. Grievances initiated at Step II must be commenced within seven (7) working days of the occurrence of the event giving rise to the grievance.

Section 4.6: For purposes of the administration of this Agreement, the Employer agrees to recognize and deal with one (1) Shop Steward or, in his absence, an Alternate Shop Steward. Such Shop Steward shall be elected or selected inthe manner decided by the Union. The number of Shop Stewards may be enlarged by agreement of the parties. The Union shall notify the Employer of the identity of the Shop Stewards.

Section 4.7:  Grievance shall not be precessed by employees on Employer time except that (a) the existence of a potential Step I grievance may be brought to a supervisor's attention on Employer time if an emergency situation exists, or (b) a brief discussion of a grievance at Step I or Step II may be conducted on Employer time if the Employer requests the discussion.  Otherwise, grievances shall be processed off the clock.

Section 4.8:  The procedure established in this article for the resolution of complaints, disputes or controversies concerning the interpretation or application of this Agreement shall be the exclusive means for determination of such  matters.  No preceding or action in a court of law or equity or administrative tribunal shall be initiated other than to compel arbitration or to enforce or to stay enforcement of an arbitrator's award, except as specifically provided in this Agreement.

## ARTICLE V
## RIGHT OF VISITATION

Section 5.1:  A duly authorized representative of the Union shall have the right to visit the Employer's facility at reasonable times for the purpose of adjusting grievances; provided that such visitations shall not interfere with the safe, efficient and orderly operation of the Employer's business.

Section 5.2:  Where a grievance involves a question of whether an employee was paid proper wages or benefits, the Union shall be permitted reasonable opportunity to examine the payroll records of the employee involved.

## ARTICLE VI
## UNION SECURITY

Section 6.1:  Membership in the Union on and after the 30th day following the beginning of employment of each employee or following the execution date of this Agreement, whichever is the later, shall be required as a condition of employment.

Section 6.2:  All employees who are now members or hereafter become members of the Union must remain in good standing during the term of this Agreement as a condition of employment.

Section 6.3: When the Employer requires employees, the Employer shall notify the Union of the number of employees and classification required. When the Union is requested to furnish employees, the Union is requested to furnish employees, the Union agrees to supply the employer with the most competent persons available, within two working days after the date of request. The Union warrants that referrals for employment shall be made available to both members and non-members of the Union, and that in making referrals to the employer, it shall not discriminate against any applicant for employment.

The Employer shall not discriminate against employees in regard to hire or tenure of employment by reason of Union membership.

Section 6.4: By the tenth (10th) day of each calendar month, the Employer shall notify the Union, in writing, of those employees who, during the preceding calendar month, (a) had completed their first ten (10) days of work; (b) had completed their probationary period, including their date of hire; (c) had been laid off or recalled from layoff, including date of layoff, date of recall, and/or date of return to work from layoff.

## ARTICLE VII
## PROBATIONARY PERIOD

Section 7.1: During the first ninety (90) calendar days of employment or the first fifty (50) days of work, whichever is the longer, a new or rehired employee shall be considered in his probationary period. During the probationary period, an employee may be discharge or otherwise disciplined, with or without cause, without recourse to the grievance and arbitration provisions of this Agreement.

Section 7.2: Layoff of a probationary employee shall have the same effect as termination and, if rehired, he shall recommence his probationary period without credit for prior probationary service except where the layoff is for less than 30 consecutive calendar days. This Section shall not be used for the purpose of preventing employees from attaining seniority rights.

Section 7.3: Probationary employees shall have no rights under this Agreement except as otherwise provided. Upon successful completion of the probationary period, the employee shall gain seniority status, with seniority counter retroactively to the date of hire.

# ARTICLE VIII

## DISCIPLINE & DISCHARGE

Section 8.1: No employee shall be discharged, suspended or otherwise disciplined without just cause. Except as to otherwise provided by this Agreement, any disagreement between the parties as to the exactment of a disciplinary penalty shall be considered a grievance under this Agreement. If the penalty shall be found to have been without just cause or too severe, the employee shall be awarded such redress as the parties may agree or an arbitrator determine.

Section 8.2: In any arbitration proceeding involving a disciplinary matter, including discharge, lack of prior warning to the employee (except where required by published Plant Rules) and/or the employee's length of service shall not be considered as matters of defense or mitigation. In any such proceeding, the Employer shall have the burden of going forward, but the burden of persuasion by a clear preponderance of the evidence shall be borne by the Union.

Section 8.3: In interpreting the term "just cause", the parties and/or arbitrator shall give full weight to the Employer's interest in maintaining an efficient, reliable and well-disciplined operation and shall not treat a disciplinary matter as being inthe nature of a criminal proceeding and, in particular, shall not interpret a discharge as being the industrial relations equivalent of "capital punishment".

## ARTICLE IX
## NON-DISCRIMINATION

Section 9.1: No employee shall be discriminated against by the Employer or the Union because of his race, religious creed, color, age, sex, or national origin.

Section 9.2: Alleged violations of Section 9.1 of this Agreement shall be subject tot he grievance provisions of this Agreement but, in view of the statutory remedies available, shall not be subject to arbitration unless the aggrieved employee includes a written waiver, containing terms satisfactory to the Employer and the Union, of containing terms satisfactory to the Employer and the Union, of containing terms satisfactory to the Employer and the Union, of statutory remedies and agreeing to be bound by the arbitration award.

## ARTICLE X
## NON-BARGAINING UNIT EMPLOYEES

Section 10.1:  There shall be  no restriction on the right of supervisors and other non-bargaining unit employees to perform work also performed by employees covered by this Agreement so long as their duties do not consist solely of performing such bargaining unit work, and provided further such work does not directly cause the layoff of bargaining unit employees.

Section 10.2:  The Union shall be notified within ten (10) working days after the execution of this Agreement of the identity of the Employer's supervisors and the extent of their authority over the employees and in the administration of this Agreement.

## ARTICLE XI
## HOURS OF WORK

Section 11.1:  For full-time employees, the normal work week shall consist of forty (40) hours, and the normal work day shall consist of eight (8) hours.

Section 11.2:  The provisions of Section 11.1 of this Agreement shall not be construed (a) as a guaranteed of work or (b) as a limitation on the Employer's right to schedule work or (c) as a limitation on the Employer's right to require employees to work in excess of forty (40) hours in a week or eight (8) hours in a day.

Section 11.3:  (d)  Overtime pay, at the rate of time and one-half, shall be paid for all hours actually worker, including paid break periods, in excess of eight (8) hours in each day or forty (40) during the payroll week.

Section 11.4:  Each employee shall be entitled to a thirty (30) minute unpaid lunch period commencing between three (3) hours and five (5)  hours after he starts work.

Section 11.5:  Each employee shall be entitled to one (1) rest period of fifteen (15) minutes during the regular work day, as scheduled by the Employer.

Section 11.6:  Employees shall be compensated at their regular rates for all waiting time resulting from breakdowns unless the Employer directs the employees to leave the plant or unless the breakdown is caused by reasons beyond the control of the Employer, such as fire or power failure.

Section 11.7:  The Employer will maintain and post a schedule of reporting times. The Employer will give no less than forty-eight (48) hours notice to the Union of changes in such reporting times, absent unusual or unforeseen circumstances, in which case the Union shall waive its right to such notice.

## ARTICLE XII
## SENIORITY

Section 12.1: An employee's seniority shall be measured by his length of continuous service, as measured by his date of hire, in the bargaining unit covered by this Agreement.

Section 12.2: Seniority shall govern in the event of layoff and recall, provided that the senior employee shall posses in the opinion of the Employer the present ability to satisfactorily perform the available work.

Section 12.3: An employee shall lose his seniority for any of the following reasons:

a.  Voluntary quit (including absence from work without notice to the Employer for a period of three (3) consecutive work days), resignation or retirement.

b.  Discharge for cause.

c.  Failure to return to work as scheduled from a leave of absence or vacation, unless prevented from doing so by reasonable cause and after prior notice to the Employer that he will not be returning as scheduled.

d.  Failure to return to work within five (5) work days after being sent a notice of recall by the Employer by certified mail, return receipt requested, to the employee's last address carried on the Employer's rolls, or failure to return to work within three (3) work days after receipt of notice of recall by any means.

e.  Engaging in gainful employment of any nature during a period of leave of absence without express written permission of the Employer.

f.  Layoff for a period of six (6) consecutive months.

g.  Absence from active employment for a period in excess of six (6) months due to medical leave or other leave of absence, unless such period is extended in writing by the Employer (with a copy to the Union) in its sole discretion, unless the employee has a statutory right to be absent for a long period (example, military service).

-8-

Section 12.4:  At the time of the execution of this Agreement, the Employer shall furnish the Union with a current seniority list.

## ARTICLE XIII
## LEAVE OF ABSENCE

Section 13.1:  _Injury, Illness or Disability Leave._  An employee shall be entitled to a leave of absence for a period of up to six (6) months for reason of **bona fide** personal illness, injury, or disability.  Such leave of absence may be extended beyond six (6) months upon written application of the employee and written agreement of the Employer.

Section 13. 2:  As a condition of reinstatement following a leave of absence for injury, illness or disability, the Employer may require the employee to present satisfactory evidence, including a physician's statement, of ability to return to full employment status.

Section 13.3:  Leaves of absence for other reasons maybe granted by the Employer units sole discretion.

Section 13.4:  The Leaves of absence provided by this Article shall only apply to employees who have completed one (1) year of service, and shall be without pay and without loss of seniority.

Section 13.5:  All requests for leave under this Article, and approval of such leave, shall be in writing.

## ARTICLE XIV
## HOLIDAYS

Section 14.1:  The following shall be recognized as paid holidays under this Agreement for all full-time employees who have completed the first 45 calendar days of their probationary period:

| | |
|---|---|
| EMPLOYEE'S BIRTHDAY | INDEPENDENCE  DAY |
| NEW YEAR'S DAY | LABOR DAY |
| WASHINGTON'S BIRTHDAY | THANKSGIVING DAY |
| GOOD FRIDAY | DAY AFTER THANKSGIVING |
| MEMORIAL DAY | CHRISTMAS |

Section 14.2:  To be eligible for holiday pay, the employee must be on the active payroll and must work the last scheduled work day before and the first scheduled work day after the holiday.

Section 14.3:  A day's holiday pay shall consist of eight (8) times the employee's straight-time hourly rate.

Section 14.4:  If the Employer requires an employee to work on a holiday, and the employee reports as scheduled, he shall receive one and one-half times his regular pay for all hours actually worked in addition to his holiday pay if otherwise qualified for such.  If the employee fails to report as scheduled, he shall forfeit his holiday pay.

Section 14.5:  Hours compensated under this Article shall not be included in the computation of overtime pay.

Section 14. 6:  If a holiday falls on Sunday, it shall be celebrated on Monday.  If a holiday falls on Saturday, it shall be celebrated on the preceding Friday or on the following Monday, at the  option of the Employer, with notice to the employees no later than on the Monday preceding the holiday.

## ARTICLE XV
## VACATIONS

Section 15.1:  Full-time employees shall be entitled to vacation according to their length of continuous service as of July 1:

| | | | |
|---|---|---|---|
| a. | One (1) year | - | one (1) week of vacation (40) hours |
| b. | Two (2) years | - | two (2) weeks of vacation (80) hours |
| c. | Six (6) years | - | two (2) weeks and (1) day (88) hours |

| d. | Seven (7) years | - | two (2) weeks and (2) days (96) hours |
| e. | Eight (8) years | - | two (2) weeks and (3) days (104) hours |
| f. | Nine (9) years | - | two (2) weeks and (4) days (112) hours |
| g. | Ten (10) years or more | - | three (3) weeks - (120) hours |

Section 15.2:  In order to be eligible for paid vacation in accordance with his length of service as of July 1, the employee must have worked a t least 1600 hours (including paid holiday and vacation time) during the 12 months preceding said July 1 and must be in the employ of the Employer at the time he actually takes his vacation.

Section 15.3:  A full-time employee hired between July 1 and April 1 shall be entitled to a paid vacation on the following July 1 in an amount equal to one (1) day (8 times the employee's straight-time hourly rate) for each unit of 420 hours actually worked, including paid holiday time, notwithstanding the 1600 hour provision of Section 15.2.

Section 15.4:  Each week of vacation pay shall consist of 40 times the employee's straight-time hourly rate, except as provided in Section 15.3. Each day of vacation pay shall consist of 8 times the employee' straight-time hourly rate, except as provided in Section 15.3.

Section 15.5:  All vacation to which an employee becomes entitled, on any July 1st shall be taken anytime during the year for the amount of time that is earned.  Employees entitled to two (2) or more weeks vacation shall be entitled to take that vacation when they desire, unless the operational needs of the Employer prevents such.  Seniority shall prevail when two (2) or more employees choose the same vacation period.

Section 15.6:  The Employer will pay the required amount of vacation pay in advance (on the last day worked) provided that a vacation request slip is turned in (1) month in advance.

## ARTICLE XVI
## WAGES

Section 16.1:  Regular Rate.  "Regular Rate" of pay is defined as the employee's straight-time rate of pay per hour, based on the pay grade for such employee's job classification, including any increase in compensation where applicable.

Section 16. 2:  Regular Rate.  "Probationary rate" of pay is defined as the rate of pay receive by an during his probationary period of employment.  The probationary rate shall be twenty percent (20%) less than the then minimum hourly rate for the applicable pay grade. After completion of the probationary period, employees shall receive an intermediate rate of pay which shall be ten percent (10%) below the then regular hourly rate for their applicable pay grade.  After completion of six (6) consecutive months of employment, employees shall receive the regular hourly rate for their then applicable pay grade.

Section 16.3:  All employees shall have an increase in their hourly wage and shoe bonus as follows:

| | |
|---|---|
| Effective October 14, 1996 | $.30 cents |
| Effective October 13, 1997 | $.30 cents ($40.00 shoe voucher*) |
| Effective October 12, 1998 | $.30 cents |

*(the Company will locate and negotiate with a shoe company within the closest distance to the shop as possible a contract to honor said shoe voucher within or at the price range of said shoe voucher).

Section 16.4:  A list of job classifications and their respective minimum rates of pay is attached hereto as Appendix  I.

Section 16.5:  Should the Employer substantially change the duties of a particular job classification so as to include duties requiring greater skill and training, the parties shall promptly meet and discuss and appropriate minimum hourly rate.  If the parties are unable to agree on a rate, the question may be submitted to the grievance or arbitration machinery of this Agreement.

## ARTICLE XVII
## MEDICAL INSURANCE

## (SEE SUPPLEMENTAL AGREEMENT, SECTION 3)

## ARTICLE XVIII

Section 18.1:  The employer shall continue to provide its existing State of New Jersey Disability Insurance.  A .50% credit shall be deducted from the contributions made by the Employer Article XVII.

## ARTICLE XIX
## GENERAL PROVISIONS

Section 19.1:  The Employer agrees that it will not enter into any written or verbal agreement with any employee the provisions of which are contrary to the terms of this Agreement; provided that, it shall not be a violation of this Agreement for the Employer, in its sole discretion, to provide any employee with grater compensation than required by this Agreement for any period of time the Employer so desires.  The Employer agrees to afford the Union prior notice of its decision to pay such greater compensation.

Section 19.2:  If any provision of this Agreement is held or adjudged to  be illegal or in violation of law by a court or administrative agency of competent jurisdiction, the remainder of this Agreement shall continue in full force and effect.

## ARTICLE XX
## HEALTH AND SAFETY

Section 20.1:  The Employer acknowledges its statutory obligation to provide a safe and healthy workplace and that responsibility and authority to provide for and to control health and safety in the workplace is solely and exclusively that of the Employer and not that of the Union .

Section 20.2:  The employer agrees to maintain a joint labor-management health and safety committee.  The committee shall be composed of at least two (2) representatives of management, and at least two (2) representatives of the Union selected by the Union.  It shall hold meetings as often as necessary, but not less than two (2) times a year, for the purpose of jointly considering, inspecting, investigating, and reviewing health and safety conditions and practices and investigating accidents, and for the purpose of jointly and effectively making constructive recommendations with respect thereto.

-13-

## ARTICLE XXI
## UNION DUES CHECKOFF

Section 21.1:  Upon receipt of a written authorization signed by the employee, the Employer shall, pursuant to said authorization, deduct Union dues and initiation fees from the wages of said employee.  The Employer shall deduct initiation fees of each new employee in four (4) equal installments beginning with the first pay day following receipt of the written authorization and monthly thereafter.  The Employer  shall deduct Union dues from each employee on the first payday following receipt of the written authorization.  Thereafter, the Employer, shall, not later than the first pay day of each month, deduct Union dues from the wages of each employee.  All Union dues and initiation fees deducted as aforesaid shall  be transmitted by check to the Union not later than the 10th day of each month.

Section 21.2:  Sums deducted by the Employer pursuant to this Article shall be kept separate and apart from the general funds of the Employer and shall be deemed trust funds.

Section 21.3:  The Union agrees that it will indemnify and save the Employer harmless from any and all liability, claim, responsibility, or suit which may arise out of any action taken by the Employer in carrying out the provisions of this Article.

## ARTICLE XXII
## SEVERANCE PAY

Section 22.1:  In the event any bargaining unit employee or employees are permanently laid off because of relocation of plant or other facilities beyond the New York City Standard Metropolitan Statistical Area (SMSA), or because of subcontracting of work by the Employer,  said employee or employees shall be entitled to severance pay computed as follows:

1.  Less than five (5) years of continuous employment with the Employer, there shall be no severance pay.

2.  Thereafter, one (1) day eight (8) hours  for each year of continuous employment, in no event to exceed twenty (20) days.

-14-

# ARTICLE XXIII
## SICK LEAVE BENEFIT

Section 23.1:  All employees with sufficient continuous employment shall be entitled to an annual sick leave benefit on the following basis:

| Employment | Sick Leave with Pay each Year |
|---|---|
| After one (1) year | one (1) day |
| After three (3) years | three (3) days |
| After five (5) year | five (5) days |

Section 23.2:  Unused sick leave shall be paid in cash at the end of the year.

Section 23.3:  The method of payment for a day's sick leave for hourly paid employees shall be 8 x the straight time hourly rate of pay.

Section 23.4:  When employee is out sick, he/she must call the shop foreman before start of shift.  Failure to call will result in:

1st Time:  Verbal Warning
2nd  Time:  Written Warning
3rd Time:  One (1) Day Without Pay
4th time:  Subject to dismissal

Section 23.5:  When shop foreman and other management personnel sees a worker obviously  not working at his assigned task;

1st Time:  Verbal Warning
2nd Time:  Written Warning
3rd Time:  One (1) Day without Pay
4th  Time:  Subject to Dismissal

Section 23.6:  Any employee caught taking company property from premises will be subject to immediate dismissal.

Section 23.7: Excessive absenteeism and lateness is detrimental to the Company's operations. Any employee who is absent or late beyond his/her allotted five (5) sick days per the contract must provide a doctor's certification as to his/her medical condition. Failure to do so will result in the employer's right to dismiss the employee for excessive absenteeism and lateness.

Sections 23,4; 23.5; 23.6; and 23.7 of Article XXIII will be subject to the Grievance and Arbitration Procedure as spelled out in this Agreement.

## ARTICLE XXIV
## CONVENTION LEAVE

Section 24: Leaves of absence shall be granted, upon, to no more than two employees in any one plant (except no more than one employee in any plant with 30 or less employees) for the purpose of attending a National Union Convention for no longer than five calendar days. Not more than one such convention shall be eligible during the life of this Agreement for this benefit. Four weeks advance notice shall be given to the Employer with respect to any such requested leave of absence. Employees granted such leaves of absence, shall be paid their normal rate of pay while on such leave for days that they would have otherwise worked, and in the event that a piece rate is used to calculate the earnings of the employee, that employee's rate of pay shall be the average daily rate of pay earned by the employee during the preceding two weeks, and not withstanding any other provision of this Agreement, employees granted such leaves shall be deemed to be employed and at work for all purposes of benefit, vacation, sick leave, seniority and any and all other entitlement calculations and accumulations.

## ARTICLE XXV
## DURATION OF AGREEMENT

Section 25.1: This Collective Bargaining Agreement shall become effective at 12:01 A.M., October 14, 1996 and shall continue in full force and effect through October 12, 1999 and shall be automatically renewed from year thereafter, unless sixty (60) days prior to the expiration date or any renewal thereof, notice in writing by Certified Mail is given by either party to the other of its desire to propose changes in this Agreement or of its intention to terminate the same, in which event this Agreement shall terminate on the expiration date next following said notice.

Section 25.2: Finality. The parties acknowledge that during the negotiations which resulted in this Agreement each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter within collective bargaining and that the understandings arrived at after the exercise of that right are set forth in this Agreement. Therefore, the Employer, and the Union, for the life of this Agreement, each voluntarily waives the right to bargain collectively with respect to any subject or matter referred to or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered in this Agreement. The express provisions of this Agreement or its duration, therefore, constitute the complete and total contract between the Employer and the Union with respect to rates of pay  wages, hours of work and other conditions of employment. It is further agreed that this Agreement can only be added to, detracted from, altered, amended or modified by a document in writing, signed on behalf of the parties hereto by their duly authorized Officers and Representatives.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized agents, effective as of the day and year hereinabove first written.

AMALGAMATED SERVICE ND ALLIED INDUSTRIES JOINT BOARD, AMALGAMATED CLOTHING AND TEXTILE WORKERS UNION, AFL-CIO,CLC.

BY: _____

CLAYOLA BROWN, MANAGER

MULTI-PAK CORPORATION

BY: _____

PHILIP CAHILL, PRESIDENT

## APPENDIX I

## MINIMUM RATES OF PAY PER HOUR

| JOB CLASSIFICATION | 10/17/96 | 10/18/97 | 10/13/98 |
|---|---|---|---|
| Layout | $11.65 | $11.95 | $12.25 |
| Welder-class A | $11.15 | $11.45 | $11.75 |
| Welder-class B | $ 9.65 | $ 9.95 | $10.25 |
| Painter I | $ 9.50 | $ 9.80 | $10.10 |
| Painter II | $ 9.00 | $ 9.30 | $ 9.60 |
| Drill Operator | $ 9.00 | $ 9.30 | $ 9.60 |
| Assembler-General | $ 9.00 | $ 9.30 | $ 9.60 |
| Assembler-Electrical | $ 9.00 | $ 9.30 | $ 9.60 |
| General Helper | ~~$ 9.00~~ 8.50 | $ 8.80 | $ 9.10 |

-oOo-

-18-

**SUPPLEMENTAL AGREEMENT,** dated as of October 14th, 1996 between **MULTI-PAK CORP.** (hereinafter referred to as the "**Employer**") and the **AMALGAMATED SERVICE AND ALLIED INDUSTRIES JOINT BARD, AMALGAMATED CLOTHING AND TEXTILE WORKERS UNION, AFL-CIO, CLC.,** (hereinafter referred to as the "**Union**").

## W I T N E S S E T H:

WHEREAS, the Employer and the Union have heretofore executed a Collective Bargaining Agreement (herein called the "Collective Bargaining Agreement") which is now in full force and effect, and

WHEREAS, as part of the consideration for the execution or renewal of the Collective Bargaining Agreement by the Union, the Employer agreed to contributed sums of money equal to a stated percentage of its payroll to a fund or funds to be used to provide pensions or other retirement benefits, life, medical care, hospitalization, insurance, accident and health insurance: to provide an educational assistance program for eligible employees employed by contributing employers to the Amalgamated Cleaners and Dyers Insurance Fund, and eligible children of said employees; and to provide an educational assistance program for eligible employees employed by contributing employers to the Amalgamated Cleaners and Dyers Insurance Fund, and eligible children of said employees; and to provide medical care and hospitalization for the families of such employees and to execute a supplemental agreement in the form of this Agreement providing for such contributions and the application thereof, and

WHEREAS, the Employer has heretofore entered into one or more prior supplemental agreements with the Union of the purpose of providing funds for certain of the above provisions of the within supplemental agreement, and

WHEREAS, it is the intention that the within Supplemental Agreement shall supersede all prior supplemental agreements above referred to from and after October 15, 1990.

NOW, THEREFORE, in consideration of the premises the Union and the Employer agree that the Collective Bargaining Agreement shall be supplemented as follows:

1.     The term "employees of the Employer" as used in the supplemental agreement means all of the employees of the Employer within the collective bargaining unit fixed by the Collective Bargaining Agreement, including employees during their trial period.

2.     This Supplemental Agreement shall supersede all prior supplemental agreements hereinabove referred to, from and after October 15, 1990, provided, however,1 that all sums of money paid or payable by the Employer under any prior supplemental agreement, to the Trustees designated in one or more Agreement and Declarations of Trust which accompanied, and were made part of, said prior supplemental agreements (insofar as any part of such sums of money so paid by he Employers to aid Trustees have not been expended or applied by said Trustees in accordance with the provisions of said prior supplemental agreements and prior Agreements and Declaration of Trust) shall be applied by the said Trustees tot he purposes set forth and provided for in said prior supplemental agreement and Agreement and Declaration of Trust, and subject to the provisions therein contained.

3.     Commencing on the pay day for the week of October 15, 1996 and weekly thereafter, the Employer shall pay by check to the Trustees designated under the Agreement and Declaration of Trust on December 31, 1975 of which Agreement and Declaration of Trust as ended, are herein specifically incorporated by preference, sums of money determined as follows:

(a)     Five (5%) percent of the gross weekly earnings, prior to payroll deductions, payable by the Employer to the employees for the preceding pay period.

(b)     The contributions of the Employer provided for in Paragraph 3 of the (supplemental Agreements attached hereto and incorporated herein) to provide life, accident, health and other insurance as the Trustees may reasonably determine to employees who are employed in the State of New Jersey shall be reduced by five tenths of one percent (.5%) provided, however, that the employer effectuates disability benefit insurance coverage for everyone of the aforesaid employees in an amount and with specific terms which are in conformity with all requirements of the State Disability Laws covering said employees as now in force and as they may be amended.

(c)     The Employer agrees to furnish upon the request of the Trustees of the Amalgamated Service and Allied Industries Insurance Fund, evidence that he has effectuated the insurance described in paragraph 3 hereof and that the entire cost of such insurance has been wholly borne by the employer without deductions form the employees wages.

All of the foregoing sums shall be administered and expended by the Trustees pursuant of the said Agreement and Declaration of Trust benefits upon their retirement, and life, accident and health insurance, and such other forms of group insurance for medical care and hospitalization as the Trustees may reasonably determine, to employees employed by the Employer, and the employees employed by other Employers,l all of whom are members of the group embraced within the general plan in the Cleaning and Dyeing Industry, and also to provide medical care and hospitalization for the families of such employees, and to provide educational assistance to employees and their children.

4.    The Employer shall furnish to the Trustees, upon request, such information and reports as they may require inthe performance of their duties under the Agreement and Declaration of Trust.  The Trustees, or any authorized agent or representative of the Trustees, shall have the right at all reasonable times during business hours to enter upon the premises of the Employer and to examine and copy such of the books, records, papers and reports of the Employer as may be necessary to permit the Trustees to determine whether the Employer is fully complying with the provisions of paragraph 3.

5.    No employee or member of his family shall have the option to receive instead of the benefits provided for by any of the Agreements and Declarations of Trust any part of the contribution of the Employer.  No employee or member of his family shall have the right to assign any benefits to which he may be or become entitled under any of the Agreements and Declaration of Trust or to receive cash consideration in lieu of such benefits, either upon termination of the trust herein created, or through severance of employment or otherwise.

6.    (a)    This Supplement, the Collective Bargaining Agreement and the Agreement and Declaration of Trust shall be construed as a single document, and all the provisions of the Collective Bargaining Agreement relating to the administration and enforcement thereof (including provisions for arbitration) shall apply to the administration and enforcement of this Supplement.

(b)    In the event that the Union receives written notice from one or more Trustees, designated by the Trustees for that purpose, that the Employer has failed to apply in full any sum due the Trustees under paragraph 3, and that such failure has continued for five (5) days the Union may direct its members to discontinue work until all sums due from the Employer under paragraph 3 have been paid in full.  The remedy provided for in this sub-paragraph shall be in addition to all other remedies available tothe Union and the Trustees and maybe exercised by the Union, anything in the Collective Bargaining Agreement to the contrary notwithstanding.

-21-

(c)    The Trustees, in their own names as Trustees, may institute or intervene in any preceding at law, in equity, in bankruptcy or arbitration proceedings for the purpose of effectuating the collection of any sums due to them form the Employer under the provision of paragraph 3.

7.    In the event that legislation is enacted by the Federal or State Government levying a tax or other exaction upon the Employer for the purpose of establishing a Federally of State administered system of life, health, accident, medical care or hospitalization insurance under which then employees of the employer are insured, and if and while the plan herein provided for is not accepted by the appropriate governmental agency as satisfying the obligations of the Employer to provide for the payment of benefits under such legislation, the Employer shall be credited, against the sums payable under paragraph 3, for each pay period, provided that the amount of such credit shall in no event exceed three and ninety hundredths percent (3.90-%) of the payments to be made to the insurance fund.

8.    The provisions of the Supplement shall remain in full force and effect for the full term of the Collective Bargaining Agreement and of any extensions or renewals thereof but shall terminate and come to an end with the Collective Bargaining Agreement or any extensions or renewal thereof, or prior thereto by an instrument in writing executed by the majority of the Trustees provided for in the Agreement and Declaration of Trust.

9.    The primary purpose of this Supplemental Agreement and the said Agreement and Declaration of Trust being to provide a practical plan for benefits upon retirement, and life, and educational assistance to employees and their children, accident and health insurance, and other insurance benefits for employees and their families, it is understood that the form of the plan, and of this Supplemental Agreement and of the Agreement and Declaration of Trust, shall not give rise to a literal or formal interpretation or construction shall be placed on the Supplemental Agreement, and the Agreement and Declaration of Trust, as will assist in the functioning of the plan, for the benefit of employees and their families, regardless of form.

10.    In no event will the employer be entitled to the return of any part of any contribution made hereunder.

11.    The decision of the Trustees in any matter in administering the affairs of the Trust shall be final and binding on the Fund, the employees, the Employer and the Union.

12.    The Trustees shall have the right and power to construe the provision of the retirement plan adopted by them and the terms used therein, and any construction and/or decision made or adopted by the Trustees in good faith shall be final and binding on the Employers, the Union, the Annuitants and the Employees.

-22-

13.    Neither the execution of this Supplemental Agreement nor any provision herein contained, or contained in any other agreement affecting the same, shall be deemed to release the Employer from any contribution or contributions provided for in any prior agreement or agreements, and which have become due and payable to the Trustees referred to in any such prior agreement and or agreements, prior to October 17, 1993 and not yet paid to such Trustees.

**AMALGAMATED SERVICE AND ALLIED INDUSTRIES JOINT BOARD, AMALGAMATED CLOTHING AND TEXTILE WORKERS UNION, AFL-CIO,CLC.**

BY: _____

Clayola Brown, Manager

**MULTI-PAK CORP.**

BY: _____

Philip Cahill, President

MEMORANDUM OF UNDERSTANING made as of October 12, 1999 by and between the Amalgamated Service & Allied Industries Joint Board, UNITE, AFL-CIO, CLC (the "Union") and Multi-Pack Corp. (the "Employer")

WHEREAS the Employer and the Union are parties to a collective bargaining agreement which expired on October 12, 1999 and;

WHEREAS the Employer and the Union have reached certain understandings with respect to the terms and conditions of a new collective bargaining agreement (hereinafter collectively referred to as the Agreement).

NOW THEREFORE, in consideration of the parties herinafter contained the parties agree as follows:

1. The collective bargaining agreement between the Union and the Employer covering the period October 14, 1996 through October 12, 1999 (Agreement) is extended for the period October 13, 1999 through October 12, 2002 upon all the same terms and conditions except as expressly otherwise provided herein.

**Article XVI: Wages:**

16.3    All employees shall have an increase in their hourly wage and shoe bonus as follows:

| | | |
|---|---|---|
| Effective October 12, 1999 | $.25 cents | |
| Effective October 12, 2000 | $.25 cents | ($50.00 Shoe Voucher) |
| Effective October 11, 2001 | $.25 cents | |

**Article XVII: Medical Insurance:**

The employer agrees to increase his contributions to the Amalgamated Service & Allied Industries Insurance Fund as follows:

Effective October 12, 1999 an additional one and one-half percent (1.5%) for a total of six percent (6%) contribution.

Effective October 11, 2000 an additional two percent (2%) for a total of eight percent (8%) contribution.

If, and only if, the laundry industry negotiations results in a contribution rate to the Amalgamated Service & Alied Industries Insurance Funds higher than the current 8.5%, the employer agrees to reopen negotiations for the purpose of discussing contributions to said funds.

Amalgamated Service & Allied Industries
Joint Board, UNITE, AFL-CIO, CLC                    Multi Pack Corporation

Clayola Brown, Manager                    Niel Cavanaugh, Vice-President

**EXHIBIT C**

| |
|---|
| In the Matter of<br>ARBITRATION OF DISPUTES<br><br>between<br><br>LAUNDRY, DRY CLEANING WORKERS AND<br>ALLIED INDUSTRIES HEALTH FUND, UNITE HERE! and<br>LAUNDRY, DRY CLEANING WORKERS AND<br>ALLIED INDUSTRIES RETIREMENT FUND, UNITE HERE!,<br>Petitioners,<br><br>and<br><br>MULTI-PAK CORPORATION,<br>Respondent. |

**SUBPOENA
DUCES TECUM**

To:    Multi-Pak Corporation
180 Atlantic Street
Hackensack, New Jersey 07601

## GREETING:

**WHEREAS**, a proceeding has been commenced before the Honorable Philip Ross, Impartial Chairman, between the Laundry, Dry Cleaning Workers and Allied Industries Health Fund, UNITE HERE! and Laundry, Dry Cleaning Workers and Allied Industries Retirement Fund, UNITE HERE! (hereinafter, the "Petitioners"), and Multi-Pak Corporation (hereinafter, the "Respondent"), who are all the parties named in said action,

**NOW, THEREFORE, YOU ARE COMMANDED** to appear and attend before the Honorable Philip Ross, Impartial Chairman, at the offices of the Laundry, Dry Cleaning and Allied Workers Joint Board, UNITE HERE!, located at 275 Seventh Avenue, New York, New York 10001, on the 17th day of June 2008, at 11:30 A.M. in the morning, and at any recessed or adjourned date for the giving of testimony on all matters relevant to the arbitration hearing,

**AND YOU ARE FURTHER COMMANDED** to produce for examination at such time and place all your payroll records including, but not limited to, social security quarterly reports, weekly payroll journals, state employment insurance records, cash disbursements books, summary quarterly reports and any other books or records which are required to determine your liability to the Petitioners, for the period of April 1, 2008 through the date of hearing.

**WITNESS**, Honorable Philip Ross, Impartial Chairman, at New York, New York on the 27th day of May 2008.

LAUNDRY, DRY CLEANING WORKERS AND ALLIED INDUSTRIES HEALTH FUND, UNITE HERE! and LAUNDRY, DRY CLEANING WORKERS AND ALLIED INDUSTRIES RETIREMENT FUND, UNITE HERE!

By: _____

David C. Sapp, Esq.
Attorney for Petitioners
730 Broadway, 9th Floor
New York, New York 10003-9511
(212) 539-5576

Account No. 629.0156

By Regular Mail and
Certified Mail, Return Receipt Requested
No. 7007 1490 0000 4227 8748

**EXHIBIT D**

<table>
<tr><td>

In the Matter of
ARBITRATION OF DISPUTES

between

LAUNDRY, DRY CLEANING WORKERS AND
ALLIED INDUSTRIES HEALTH FUND, UNITE HERE! and
LAUNDRY, DRY CLEANING WORKERS AND
ALLIED INDUSTRIES RETIREMENT FUND, UNITE HERE!,
Petitioners,

and

MULTI-PAK CORPORATION,
Respondent.

</td></tr>
</table>

**NOTICE OF INTENTION
TO ARBITRATE**

Sir(s):

**PLEASE TAKE NOTICE** that pursuant to the Collective Bargaining Agreement and the Supplemental Agreement thereto (hereinafter, the "Agreement") entered into between Multi-Pak Corporation (hereinafter, the "Respondent"), and the Laundry, Dry Cleaning and Allied Workers Joint Board, UNITE HERE!, and upon notice by the Laundry, Dry Cleaning Workers and Allied Industries Health Fund, UNITE HERE! and Laundry, Dry Cleaning Workers and Allied Industries Retirement Fund, UNITE HERE! (hereinafter, the "Petitioners"), an arbitration will be held before Dr. Philip Ross of 525 West End Avenue, New York, New York 10024 (hereinafter, the "Arbitrator"), designated pursuant to the Agreement, on June 17, 2008, at 11:30 A.M., at the offices of the Laundry, Dry Cleaning and Allied Workers Joint Board, UNITE HERE!, located at 275 Seventh Avenue, 7th Floor, New York, New York 10001, seeking an award against you for:

1. Contributions owed to Petitioners for the period of April 1, 2008 through the date of hearing in an estimated amount of $2,237.27;
2. All other contributions due and owing to the Petitioners as of the date of hearing;
3. Production to Petitioners of all documents required to be produced by Respondent pursuant to the Subpoena served on Respondent in this proceeding;

together with INTEREST, LIQUIDATED DAMAGES, ARBITRATOR'S FEES AND EXPENSES, ATTORNEYS' FEES and the cost of the AUDIT, if awarded.

**PLEASE TAKE FURTHER NOTICE** that unless you apply to stay this arbitration within twenty (20) days after the service of this notice upon you, you shall be precluded from

objecting that a valid agreement was not made or has not been complied with and from asserting in court the bar of a limitation of time.

Dated: May 27, 2008
      New York, New York

                                LAUNDRY, DRY CLEANING WORKERS AND
                          ALLIED INDUSTRIES HEALTH FUND, UNITE HERE! and
                            LAUNDRY, DRY CLEANING WORKERS AND ALLIED
                              INDUSTRIES RETIREMENT FUND, UNITE HERE!

By:                                
                        David C. Sapp, Esq.
                        Attorney for Petitioners
                        730 Broadway, 9th Floor
                        New York, New York 10003-9511
                        (212) 539-5576

Account No. 629.0156

By Regular Mail and
Certified Mail, Return Receipt Requested
No. 7007 1490 0000 4227 8748

Please address all inquires to
Evelyn Soto at (212) 539-5397

**EXHIBIT E**

## LAUNDRY, DRY CLEANING WORKERS AND ALLIED INDUSTRIES HEALTH FUND, UNITE HERE!
## LAUNDRY, DRY CLEANING WORKERS AND ALLIED INDUSTRIES RETIREMENT FUND, UNITE HERE!

**Name of Firm:** MULTI-PAK SALES

**A/C #:** 629.0156

| Quarter | P/R |
|---|---|
| 3Q06 | $26,274.52 |
| 2Q06 | $25,110.91 |
| 4Q05 | $18,093.64 |
| 3Q05 | $36,114.74 |
| | $105,593.81 |

+   48

| | |
|---|---|
| Average Weekly Payroll | = $2,199.87 |
| Current Rate | X 11.30% |
| Average Weekly Payment | = $248.59 |
| # of Delinquent Weeks | X 9 |
| from 04/01/08 to 05/31/08 | |
| Estimated Total Weekly Delinquency | = $2,237.27 |

## LAUNDRY, DRY CLEANING WORKERS AND ALLIED INDUSTRIES HEALTH AND RETIREMENT FUND, UNITE HERE!

| Month Delinquent | Health Fund Contribution | Interest | Months Delinquent | Interest | Liquidated Damages | Arbitrator's Fees | Total Amount Due |
|---|---|---|---|---|---|---|---|
| April-08 | $ 994.36 | 1.50% | 2 | $ 29.83 | $ 198.87 | 132.00 | $ 1,355.06 |
| May-08 | $ 1,242.91 | 1.50% | 1 | $ 18.64 | $ 248.58 | | $ 1,510.13 |
| | $ 2,237.27 | | | $ 48.47 | $ 447.45 | $ 132.00 | $ 2,865.19 |

**EXHIBIT** F

## PLAN RULES WITH RESPECT TO THE COLLECTION
## OF DELINQUENT CONTRIBUTIONS

1. Contributions are due and owing to the Fund on a weekly basis and must be received by the fund no later than four weeks from the end of each work period for those employers who pay their employees on a weekly basis. For employers who pay their employees on a biweekly basis contributions must be received by the Fund no later than three weeks from the end of each work week period.

2. When an employer's weekly contribution is not received when due a notice of delinquency is sent to the employer. (Delinquency notice #1)

3. If after 10 business days an employer has not cured its delinquency a second notice of delinquency is sent to the employer. (Delinquency notice #2)

4. When an employer is delinquent three weeks beyond the grace period (seven weeks delinquent for employers who pay their employees on a weekly basis and six weeks delinquent for employers who pay their employees on a biweekly basis) the Fund shall serve a notice of intent to arbitrate against the employer, or initiate litigation in federal or state court.

5. The Trustees shall have the authority to suspend the payment of health and welfare benefits to the employees of any employer who is deemed delinquent in accordance with these rules.

6. Pursuant to the Employee Retirement Income Security Acct of 1974 as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("ERISA"), the Fund shall, in all proceedings brought to collect delinquent contributions and/or audit deficiencies seek, in additions to said delinquent contributions and/or audit deficiencies.

    a) Interest at the rate of 18% on all sums due

    b) Liquidated damages equal to 20% of the delinquent contributions

    c) Attorney's fees, audit fees and costs of the proceeding.

    d) Such other legal and equitable relief as deemed appropriate.

Interest shall accrue from the date upon which the obligation first became delinquent.